**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| TREMAYNE DURHAM,<br>Plaintiff,<br>v.<br>G. KELLEY, *et al.*,<br>Defendants. | Civil Action No. 21-4565 (MAS) (JBD)<br>**OPINION** |

**SHIPP, District Judge**

This matter comes before the Court on two motions for summary judgment under Federal Rule of Civil Procedure 56: (1) the motion of Defendants Susan Spingler and Mobolanle Ebo (together, the "Medical Defendants") (ECF No. 107); and (2) the motion of Defendants Gregory Kelley, Bryant Correa, Matthew Doyle, William Gray, Zachary Goodwin, Lawrence Jovanovic, and Kendrick Vega (together, the "Corrections Officer Defendants") (ECF No. 110). Plaintiff Tremayne Durham, who is represented by pro bono counsel, opposed both motions (ECF Nos. 113, 114), and Defendants replied (ECF Nos. 115, 116). The Court has carefully considered the parties' submissions and decides the motions without oral argument under Federal Rule of Civil Procedure 78 and Local Civil Rule 78.1. For the reasons below, the Medical Defendants' motion is **GRANTED**, and the Corrections Officer Defendants' motion is **DENIED**.

This case arises from the days in May 2020 that Plaintiff spent in a COVID-19 quarantine unit at New Jersey State Prison ("NJSP") without the cane he used to walk, which ended when he fell in the shower. The Third Circuit has held that Plaintiff's Complaint states claims under the Eighth Amendment, the Americans with Disabilities Act ("ADA"), and the Rehabilitation Act

("RA"). The question now is whether the summary judgment record supports those claims against each moving Defendant.

# I. BACKGROUND

## A. Factual Background

The following facts come from the parties' statements of material facts under Local Civil Rule 56.1 and the record evidence they cite.[1] They are undisputed unless noted. Where the parties dispute a fact, the Court views the evidence in the light most favorable to Plaintiff.

### 1. Plaintiff's Condition and His Cane

At the relevant time, Plaintiff was incarcerated at NJSP. He was diagnosed with lumbar stenosis in January 2018. (Med. SUMF ¶ 1; Pl.'s Med. Resp. ¶ 1; CO SUMF ¶ 1; Pl.'s CO Resp. ¶ 1.) In February 2019, he reported increased back pain and asked for a cane, and on May 20, 2019, a prison physician, Dr. Robin Miller, prescribed one. (Med. SUMF ¶¶ 2, 5; Pl.'s Med. Resp. ¶¶ 2, 5.) On November 11, 2019, Dr. Ashraf Haggag issued a new cane order, which directed Plaintiff to "[u]se for ambulation for 6 months" and noted a "Hx of spinal stenosis." (Cane Order, ECF No. 113-4; Med. SUMF ¶ 6; Pl.'s Med. Resp. ¶ 6.) Six months from that order's start date fell on about May 11, 2020. (Med. SUMF ¶ 8; Pl.'s Med. Resp. ¶ 8.) Plaintiff did not seek a renewal before then, although the kiosk on his regular housing tier was working. (Med. SUMF ¶ 10; Pl.'s

[1] The Court cites deposition transcripts by the transcripts' own page and line numbers; where a party's citation differs from the printed pagination, the Court has cited the printed pages. The Court refers to the parties' Rule 56.1 submissions as follows: the Medical Defendants' statement of undisputed material facts ("Med. SUMF," ECF No. 107-2); Plaintiff's response and supplemental statement ("Pl.'s Med. Resp." and "Pl.'s Med. SSMF," ECF No. 113-7); the Medical Defendants' response to that supplemental statement ("Med. Resp. to SSMF," ECF No. 115-1); the Corrections Officer Defendants' statement ("CO SUMF," ECF No. 110-2); Plaintiff's response and supplemental statement ("Pl.'s CO Resp." and "Pl.'s CO SSMF," ECF No. 114-15); and the Corrections Officer Defendants' response to that supplemental statement ("CO Resp. to SSMF," ECF No. 116-1). The Court addresses the Medical Defendants' objection to the form of Plaintiff's responses in Part III.A.2.

Med. Resp. ¶ 10; Durham Dep. II 99:22–100:12, ECF No. 113-3.) He testified that he was not thinking about the order's expiration at the time. (Durham Dep. I 42:11–17, ECF No. 113-2.)

The parties dispute what the lapse meant. Defendants treat the end of the six-month period as the end of Plaintiff's authorization to possess a cane. (Med. SUMF ¶¶ 7–9; CO SUMF ¶¶ 8–11.) Plaintiff responds that the order did not say his condition would resolve after six months or direct anyone to take the cane, that he kept and used the cane after the six months expired, and that earlier renewals had never required him to give it up. (Pl.'s Med. Resp. ¶¶ 7–9; Pl.'s CO Resp. ¶¶ 8–11; Durham Dep. II 81:1–83:9.) Plaintiff possessed and actively used the cane immediately before he entered quarantine. It helped him walk and made him feel safer doing so, and staff, other inmates, and officers had seen him with it. (Pl.'s Med. SSMF ¶¶ 2–4; Med. Resp. to SSMF ¶¶ 2–4; Pl.'s CO SSMF ¶¶ 1–3; CO Resp. to SSMF ¶¶ 1–3; Durham Dep. II 52:23–54:3.) His condition makes it harder to walk, move around, stay steady, and shower, and the cane improves his steadiness in the shower. (Durham Dep. II 91:12–92:7; Pl.'s CO SSMF ¶¶ 31–32.) The Corrections Officer Defendants "took no position" on whether Plaintiff needed his cane after the order lapsed. (CO Defs.' Reply Ltr. 5, ECF No. 116.)

**2. The Move to Quarantine**

On or about May 22, 2020, Plaintiff tested positive for COVID-19 and was moved from his regular housing unit, 2-Left, to the 7-Wing quarantine unit. (Med. SUMF ¶ 19; Pl.'s Med. Resp. ¶ 19; CO SUMF ¶ 12; Pl.'s CO Resp. ¶ 12.) He was told to go right away. (Durham Dep. II 54:6–20.) Plaintiff testified that he told Officer Doyle he needed his cane, that Doyle ordered him to leave it in his cell, and that he complied. (Durham Dep. I 41:7–12; Durham Dep. II 93:20–94:7; *see* CO Resp. to SSMF ¶ 5 (undisputed that Plaintiff so testified).) Doyle does not recall any such interaction. (Doyle Dep. 33:6–19, ECF No. 114-10.) Plaintiff also testified that Nurse Neal West,

who is not a party to these motions, told him he could not have the cane in quarantine. (Durham Dep. II 93:20–94:12.)

### 3. The 7-Wing Unit, the Cane Restriction, and the Showers

7-Wing had been closed for a time. NJSP's administrative segregation ("ad-seg") population had been moved elsewhere, and the unit was reopened to house inmates in COVID-19 quarantine, who were sent there because they tested positive and not because they had committed disciplinary infractions. (Gray Dep. 21:19–22:7, ECF No. 114-6; Correa Dep. 36:8–16, ECF No. 114-9; Pl.'s CO SSMF ¶¶ 22–23; CO Resp. to SSMF ¶¶ 22–23 (undisputed).) The officers who worked there testified that the unit ran under ad-seg procedures. Correa agreed that "the policies and procedures of 7 Wing were ad seg procedures," and Gray testified that staff "pretty much almost treated it like it was ad-seg," a practice his supervisors authorized: "That's how we ran it." (Correa Dep. 41:20–23, 73:4–8; Gray Dep. 28:8–16; CO Resp. to SSMF ¶ 24 (quoting the same testimony), ¶ 25 (undisputed).) Both understood that an inmate in ad-seg could not keep a cane. (Correa Dep. 42:13–18, 50:1–6; Gray Dep. 25:13–26:5.) Gray, however, had never read any such policy and relied on what "fellow officers" told him. (Gray Dep. 26:6–11.) Correa's understanding was that an inmate would need a "script" for a cane and that the script "would need to be updated after a certain period of time." (Correa Dep. 42:23–43:4.) Goodwin, an officer on Plaintiff's former unit, could not recall any policy addressing cane use in quarantine or moving a cane into a quarantine unit. (Goodwin Dep. 9:17–18, 27:5–20, ECF No. 114-7; CO Resp. to SSMF ¶ 21 (undisputed).)

The written procedure the Corrections Officer Defendants cite governs the "West Compound Administrative Segregation Units." (NJSP Internal Mgmt. Procedure NJSP.CUS.302 ("Ad-Seg IMP"), ECF No. 114-12; CO SUMF ¶¶ 13–14.) It provides that "[t]he only permitted

property is that which is either specified in this policy or any addendum to this policy," and that an item not specified "shall not be permitted for possession by inmates on Administrative Segregation status." (Ad-Seg IMP at DEF 019.) Its list of permitted items, which includes prescription eyeglasses and a mattress "unless medically approved for additional," does not mention canes or other mobility aids. (*Id.* at DEF 020.) A separate Department of Corrections procedure, MED.IMHC.12, applies "to all units of all DOC Institutions." (MED.IMHC.12, ECF No. 114-11 at 2.) Its stated purpose is to assure that "aids to impairment are provided when the health or ability to perform activities of daily living of the inmate would otherwise be adversely affected," and it states that "aids to impairment such as canes, crutches or wheelchairs will be available when an inmate's health would be adversely affected without such devices." (*Id.*) The copy in the record was last revised in February 2021, after the events at issue, but both sides rely on it as the governing procedure. (*See* CO Defs.' Reply Ltr. 6–7; Pl.'s CO Opp'n Br. 9–10, ECF No. 114.)

Inmates in 7-Wing showered one at a time. An officer opened the inmate's cell, and the inmate walked down a hallway past barred cell doors to a separate shower room, and the door was locked behind him until an officer reopened it. (Correa Dep. 41:13–19, 46:12–23, 47:12–21, 48:22–49:4.) Correa agreed that a cane could be used as a weapon, but also that an inmate could use any object that way. (*Id.* at 48:8–13, 49:6–8.) The quarantine shower had no chair or handrails. (Durham Dep. I 45:5–18; Pl.'s CO SSMF ¶ 33.) The Corrections Officer Defendants "dispute" this only because "a picture of the shower was not produced in discovery." (CO Resp. to SSMF ¶ 33.) The Medical Defendants admit it for purposes of their motion. (Med. Resp. to SSMF ¶ 20.)

### 4. Plaintiff's Requests to the Officers

Plaintiff testified that during quarantine he told several officers that he had back pain and needed his cane. He told Correa he was in serious pain and needed the cane, and Correa telephoned Plaintiff's former housing unit about it. (Durham Dep. I 41:13–21.) On May 26, Plaintiff expressed that he had severe back pain and asked Vega for access to the cane. (*Id.* at 43:7–10.) On May 30, he told Kelley that he had back pain and needed the cane. (*Id.* at 44:14–17.) And when he spoke to correctional staff, he did not only report back pain and ask for the cane; he also asked to see a doctor. (*Id.* at 69:22–70:3.) None of this produced the cane before he fell. (Pl.'s CO SSMF ¶ 19; CO Resp. to SSMF ¶ 19 (undisputed).)

The verified Complaint adds that when Correa telephoned the 2-Left housing unit on May 24, Goodwin relayed that Plaintiff "complains" too much and that the officers would not open his cell for the cane, and Jovanovic said that Plaintiff was "an asshole" who "gets nothing." (Compl. ¶ 26, ECF No. 1.) The deposition transcripts in the record do not address the call, and the Corrections Officer Defendants have offered no evidence denying it. (*See* CO SUMF ¶ 15 (citing Compl. ¶ 26 among the paragraphs describing Plaintiff's requests).)

The officers' testimony is largely one of limited recollection. Gray recalls Plaintiff asking him for the cane in 7-Up. Gray told Plaintiff that he "would look into it and ask a supervisor," and he explained that a supervisor would probably investigate further and speak with medical staff, but he does not recall whether he did either, or whether Plaintiff complained of back pain. (Gray Dep. 30:3–20, 31:18–33:18, 34:18–20; Pl.'s CO SSMF ¶¶ 9–12; CO Resp. to SSMF ¶¶ 9–12 (undisputed).) Correa and Doyle do not recall Plaintiff. (Correa Dep. 49:18–25; Doyle Dep. 33:6–19.) Goodwin recalls that Plaintiff had a cane, and Jovanovic saw the cane in Plaintiff's 2-Left cell during a routine search and left it there. (Goodwin Dep. 24:6–25:9; Jovanovic Dep. 16:23–18:13,

ECF No. 114-8.) Goodwin testified that if an inmate asked for a medical device he needed, he would contact the medical department. (Goodwin Dep. 16:20–25.) Neither side cites testimony from Vega or Kelley.

**5. Plaintiff's Requests to the Nurses and the Channels for Seeking Care**

Plaintiff testified that he told Spingler, "I just told her I had back pain, and I wanted my cane," and that she "said basically there was nothing she could do about it." (Durham Dep. I 72:14–24.) He could not remember any reason she gave. (*Id.* at 72:25–73:3.) Spingler does not recall any request from Plaintiff for his cane. (Spingler Dep. 21:13–15, ECF No. 113-5.) The Medical Defendants accept Plaintiff's account for purposes of their motion. (Med. Resp. to SSMF ¶¶ 7–8.) Plaintiff testified that he told Ebo the same thing, with the same result. (Durham Dep. I 73:4–8; Durham Dep. II 68:6–13.) The Medical Defendants accept that too and place the conversations on May 30 and 31. (Med. Resp. to SSMF ¶¶ 11–12; Med. Defs.' Reply Br. 5, ECF No. 115.) Plaintiff does not cite testimony that he asked either nurse to see a doctor.

The parties agree on the nurses' roles. Spingler was NJSP's infection control nurse; she visited 7-Wing as needed, mainly for COVID-positive cases and retesting, and could not write prescriptions or make diagnoses. (Med. SUMF ¶¶ 12–14; Pl.'s Med. Resp. ¶¶ 12–14.) Ebo was a per diem nurse. (Med. SUMF ¶ 18; Pl.'s Med. Resp. ¶ 18.) Both were employed by University Correctional Healthcare ("UCHC"), a constituent unit of Rutgers, The State University of New Jersey. (Med. SUMF ¶¶ 11, 17; Pl.'s Med. Resp. ¶¶ 11, 17.) Nurses entering a tier were accompanied by an officer and held no keys to the 7-Wing housing units. (Med. SUMF ¶¶ 25–26; Pl.'s Med. Resp. ¶¶ 25–26.) Spingler knew of Plaintiff's history of back pain and had sometimes seen him with a cane. (Spingler Dep. 16:20–17:2.) As she described the process, a nurse told by a quarantined inmate that he wanted to see a doctor could, "depending on the urgency," contact

medical or instead "inquire more" and direct the inmate to the nonemergency process. (*Id.* at 20:14–24.) A request for a mobility aid without a current prescription would go through sick call, where a nurse would triage it and, if warranted, refer it to a provider. (*Id.* at 23:21–24:6.) When sick-call slips were unavailable, nurses visited the area twice a day, or the inmate could tell an officer, who would contact medical. (*Id.* at 21:8–12.) A nurse could give an inmate a device directly only if there was a "current order." (*Id.* at 22:10–12.)

Plaintiff could not use the ordinary channels. The kiosk in the quarantine unit was broken. (Durham Dep. II 57:13–58:19; Med. Resp. to SSMF ¶ 16 (admitting for purposes of the motion).) And an inmate in 7-Up could not retrieve a paper medical request form on his own; he had to ask an officer or medical staff for one. (Gray Dep. 37:17–25; CO Resp. to SSMF ¶ 16 (undisputed).) Neither Medical Defendant has personal knowledge regarding whether the kiosk was working. (Med. Resp. to SSMF ¶ 16.)

### 6. The Fall and Its Aftermath

On May 31, 2020, Plaintiff went to shower. Pain shot from his lower back down his legs, and he fell to the floor and injured his shoulder. (Med. SUMF ¶¶ 27–28; Pl.'s Med. Resp. ¶¶ 27–28; Durham Dep. I 45:5–25.) Plaintiff testified that he did not faint and that he fell because he did not have his cane. (Durham Dep. II 69:19–70:11.) Defendants offer no contrary evidence of how the fall happened. (*See* CO Resp. to SSMF ¶ 34; Med. Resp. to SSMF ¶¶ 21–22.)

Ebo responded at about 4:45 p.m. and found Plaintiff alert and oriented, reporting pain of 10 out of 10 in his lower back. (Med. SUMF ¶ 29; Pl.'s Med. Resp. ¶ 29.) She contacted the on-call provider, who ordered Plaintiff admitted to the infirmary, ibuprofen, and review by the in-house provider the next morning. (Med. SUMF ¶¶ 30–31; Pl.'s Med. Resp. ¶¶ 30–31.) Plaintiff received further care over the following days. On June 3, 2020, Dr. Miller entered a new order for a cane,

and on June 4 he cleared Plaintiff to return to his housing unit. (Med. SUMF ¶¶ 32–43; Pl.'s Med. Resp. ¶¶ 32–43.) Plaintiff does not challenge the care he received after the fall. (Pl.'s Med. Opp'n Br. 11, ECF No. 113.)

### B. Procedural History

Plaintiff, proceeding *pro se*, filed this action on March 9, 2021, against numerous NJSP officers and medical staff. He asserted claims under 42 U.S.C. § 1983, Title II of the ADA, 42 U.S.C. § 12131 *et seq.*, and Section 504 of the RA, 29 U.S.C. § 794. (Compl., ECF No. 1.) The Complaint is verified under penalty of perjury. (*Id.* at 24.) This Court screened the Complaint under 28 U.S.C. § 1915A, dismissed it for failure to state a claim, and entered a final dismissal when Plaintiff asked for final judgment. (ECF Nos. 2, 4, 6.)

The Third Circuit vacated that dismissal in a precedential opinion. *Durham v. Kelley*, 82 F.4th 217 (3d Cir. 2023). As relevant here, the court held that Plaintiff plausibly alleged that he was denied equal access to the prison showers because of his disability and that Defendants were deliberately indifferent to his need for accommodation, *id.* at 225–26; that sovereign immunity did not bar his ADA and RA damages claims at the pleading stage, *id.* at 228; and that he plausibly alleged an Eighth Amendment violation, *id.* at 229–30. The court observed that Plaintiff alleged that he told "anyone and everyone" that he needed his cane and was in severe pain, and that some officials refused to help because he complained and was an "asshole." *Id.* at 226, 230. It expressed no view on whether Plaintiff would ultimately be able to prove his claims. *See id.* at 226–27.

On remand, this Court reopened the case and directed that the Complaint proceed. (ECF No. 13.) The Court later appointed pro bono counsel. (ECF No. 68.) The Medical Defendants answered (ECF No. 44), as did the Corrections Officer Defendants (ECF No. 85), and the parties conducted discovery under the Magistrate Judge's supervision. The Complaint remains the

operative pleading. On September 11, 2026, the Medical Defendants and the Corrections Officer Defendants each moved for summary judgment. (ECF Nos. 107, 110.) Plaintiff opposed both motions (ECF Nos. 113, 114), and Defendants replied (ECF Nos. 115, 116). The Magistrate Judge granted the Medical Defendants' motion to seal certain exhibits. (ECF No. 117.)[2]

## II. LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit under the governing law," and a dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The movant bears the initial burden of showing the absence of a genuine dispute, which it may do by pointing to the absence of evidence supporting an essential element of the non-movant's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986). The non-movant must then point to specific evidence in the record showing a genuine dispute for trial, and it must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *see* Fed. R. Civ. P. 56(c)(1). The Court need consider only the materials the parties cite, though it may consider others in the record. Fed. R. Civ. P. 56(c)(3).

The Court views the facts and draws all reasonable inferences in the non-movant's favor, and it may not weigh the evidence or make credibility determinations. *Anderson*, 477 U.S. at 255; *Tolan v. Cotton*, 572 U.S. 650, 656–57 (2014) (per curiam). In this District, the party opposing summary judgment must file a responsive statement of material facts "addressing each paragraph

---

[2] Other defendants named in the Complaint, among them Nurse West and Officers Rodriguez and Vincente, are not parties to these motions, and the Court does not address any claim against them.

of the movant's statement, indicating agreement or disagreement and, if not agreed, stating each material fact in dispute and citing to the affidavits and other documents submitted in connection with the motion; any material fact not disputed shall be deemed undisputed for purposes of the summary judgment motion." L. Civ. R. 56.1(a). A verified complaint may be treated as an affidavit opposing summary judgment to the extent it rests on the plaintiff's personal knowledge. *Reese v. Sparks*, 760 F.2d 64, 67 & n.3 (3d Cir. 1985); *see* Fed. R. Civ. P. 56(c)(4); 28 U.S.C. § 1746.

## III. DISCUSSION

### A. Preliminary Matters

#### 1. The Claims Before the Court

Plaintiff's claims arise under two bodies of law. First, he asserts that Defendants violated the Eighth Amendment, through 42 U.S.C. § 1983, by being deliberately indifferent to his serious medical needs. Those claims seek damages from Defendants in their individual capacities. *Durham*, 82 F.4th at 223–25, 229–30. Second, he asserts that Defendants denied him safe access to the quarantine shower in violation of Title II of the ADA, 42 U.S.C. § 12132, and Section 504 of the RA, 29 U.S.C. § 794(a). Those claims proceed against Defendants in their official capacities only, because the ADA and the RA do not authorize claims against individuals in their individual capacities. *See id.* at 223–25; *Montanez v. Price*, 154 F.4th 127, 145 (3d Cir. 2025). An official-capacity claim "is not a suit against the official but rather is a suit against the official's office" and so "is no different from a suit against the State itself." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989). The ADA and RA claims against the Corrections Officer Defendants are therefore, in substance, claims against the State through its corrections department, and the claims against the Medical Defendants likewise run against the public entity that employs them and not against the nurses personally.

### 2. Local Civil Rule 56.1

The Medical Defendants contend that Plaintiff's responses to their statement of material facts are legal argument rather than responses and that their facts should be deemed admitted. (Med. Defs.' Reply Br. 2–3, ECF No. 115.) The Court declines to go that far. Plaintiff admitted most of the Medical Defendants' statements outright, and where he qualified an admission, the qualification generally identified the inference he draws, not a different set of facts. The Court treats each of Defendants' statements as undisputed unless Plaintiff identifies record evidence that conflicts with it, and it disregards legal argument in the statements. *See* L. Civ. R. 56.1(a). Defendants, for their part, responded to each of Plaintiff's supplemental statements, so the Court has both sides' positions on every fact. The Corrections Officer Defendants' response to the statement that the quarantine shower had no chair or handrails illustrates the point. They "dispute" it because a photograph was not produced, but the absence of a photograph is not evidence that the shower had a chair or handrails, and it does not create a genuine dispute. *See* Fed. R. Civ. P. 56(c)(1), (e)(2).

### 3. The Verified Complaint

The Complaint is signed under penalty of perjury. 28 U.S.C. § 1746. To the extent it rests on Plaintiff's personal knowledge, the Court treats it as an affidavit. *Reese*, 760 F.2d at 67 & n.3. The Corrections Officer Defendants themselves rely on the Complaint's allegations, including paragraph 26, in their own statement of facts. (CO SUMF ¶ 15.)

## B. The Medical Defendants' Motion

The Medical Defendants seek summary judgment on Plaintiff's Eighth Amendment claims against them individually, his ADA and RA claims against them in their official capacities, and

any claim for prospective relief. Plaintiff opposes the motion except to the extent it asks the Court to find prospective relief moot. (Pl.'s Med. Opp'n Br. 15, ECF No. 113.)

**1. The Eighth Amendment Claims**

*a. The governing standard.* The Eighth Amendment obligates prison officials to provide medical care to those they incarcerate. *Estelle v. Gamble*, 429 U.S. 97, 103–04 (1976). To prevail on a claim of deliberate indifference, a plaintiff must show (1) a serious medical need, (2) that the defendant was deliberately indifferent to that need, and (3) that the deliberate indifference caused him harm. *Durham*, 82 F.4th at 229 (citing *Atkinson v. Taylor*, 316 F.3d 257, 266 (3d Cir. 2003)). The Medical Defendants assume for purposes of their motion that Plaintiff's lumbar stenosis was a serious medical need. (*See* Pl.'s Med. Opp'n Br. 5 (citing ECF No. 107-1 at 7).) The dispute is about the second element.

That element is subjective. An official is deliberately indifferent only if he "knows of and disregards an excessive risk to inmate health or safety"; he "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). A factfinder may infer knowledge from the obviousness of a risk, *id.* at 842, and an official who knew of a substantial risk may escape liability if he "responded reasonably to the risk," *id.* at 844. The Third Circuit has found deliberate indifference in a variety of circumstances, including where an official "(1) knows of a prisoner's need for medical treatment but intentionally refuses to provide it; (2) delays necessary medical treatment based on a non-medical reason; or (3) prevents a prisoner from receiving needed or recommended medical treatment." *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999). It has also described indifference as manifested by "denial of prescribed medical treatment, or a denial of reasonable requests for treatment that leads to suffering or risk of injury."

*Durham*, 82 F.4th at 229–30 (quoting *Durmer v. O'Carroll*, 991 F.2d 64, 68 (3d Cir. 1993)). Plaintiff is right that these categories are illustrative and not exclusive, but whatever form deliberate indifference takes, the touchstone is subjective recklessness. *See Rouse*, 182 F.3d at 197.

That standard is demanding. Negligence is not enough, and neither is gross negligence. *DiFraia v. Ransom*, 171 F.4th 622, 628–29 (3d Cir. 2026). Deliberate indifference is "a stringent standard," and the Third Circuit has typically "let medical-care claims proceed only when care was all but absent." *Id.* at 629. An official risks violating the Eighth Amendment "if he invokes nonmedical reasons to delay or deny care that is medically necessary," but "[i]t is not enough that a treatment might make a prisoner's life easier." *Id.* at 630. The nonmedical reasons that have sufficed are of a particular kind: retaliation, the deliberate infliction of pain or harm, and a refusal to treat at all based solely on cost. *Id.* at 629–30 (citing *Durmer*, 991 F.2d at 68 & n.10).

*b. Discussion.* Plaintiff's theory is that the nurses did nothing. Crediting his testimony, each nurse heard that he had back pain and wanted his cane, and each said there was nothing she could do. (Durham Dep. I 72:14–24, 73:4–8.) Plaintiff reasons that because neither nurse assessed him, referred him, or contacted a provider before he fell, care was "all but absent," and that the nurses relied on nonmedical constraints, namely custody's control over property and the lapsed order, to refuse a medically necessary cane. (Pl.'s Med. Opp'n Br. 6–9, 11–12.) The question is whether a reasonable jury could find that either nurse actually knew of and consciously disregarded a substantial risk of serious harm to Plaintiff. The Court does not doubt that Plaintiff's days in quarantine were painful or that his cane would have helped him. But on this record a jury could not make that finding, for five reasons.

*First*, the evidence of what each nurse knew is slight. Plaintiff does not contend that either nurse saw an injury or an emergency, or that either was told that he could not walk or stand, that

he was falling, or that he was about to shower without support. What Plaintiff cites is that he told each of them he had back pain and wanted his cane.[3] He described his statement to Spingler as "just" that, and he describes his statement to Ebo the same way. (Durham Dep. I 72:20–21, 73:4–8; Durham Dep. II 68:6–13.)[4] Nor does Plaintiff point to evidence that either nurse knew that the kiosk and paper forms were unavailable to him or that the quarantine shower lacked a chair or handrails. (Med. Resp. to SSMF ¶¶ 16, 18, 20.) What the record shows the nurses were told, then, is that a patient with a chronic back condition and no current cane order was reporting back pain and asking for a cane. That is a request neither could grant. Without more, it is not notice of a substantial risk of serious harm.

*Second*, a nurse's statement that "nothing could be done" is consistent with a lack of authority, and it is not evidence of conscious disregard. It is undisputed that Spingler, as an infection control nurse, could not prescribe or diagnose; that nurses entered the tier only with an officer and held no keys to the housing units; and that a nurse could provide a device herself only if there was a current order. (Med. SUMF ¶¶ 13, 25–26; Pl.'s Med. Resp. ¶¶ 13, 25–26; Spingler Dep. 22:10–12.) Plaintiff himself testified that, in his view, the nurses could at most have tried to speak with someone who could retrieve the cane. (Durham Dep. II 88:7–90:10.)

*Third*, the existence of steps a nurse could have taken does not show that she perceived a risk that demanded them. Spingler testified that, depending on the urgency of a request, a nurse could contact medical or direct a nonemergency request to sick call, and that nurses made rounds

[3] Plaintiff testified more generally that when he made requests he also said he wanted to see a doctor, but he described that testimony as concerning "the correctional staff," and he does not cite it as to the nurses. (Durham Dep. I 69:22–70:3; *see* Pl.'s Med. Opp'n Br. 6–9.)

[4] The verified Complaint describes his pain as "agonizing" when he spoke to Spingler and "acute" when he spoke to Ebo. (Compl. ¶¶ 32, 42, 46.) Those adjectives characterize Plaintiff's own condition; they do not show what either nurse observed or understood from the exchanges that Plaintiff described under oath and relies on in his brief.

in the quarantine area twice a day. (Spingler Dep. 20:14–21:12.) Plaintiff argues that this proves the nurses could have assessed, referred, or escalated his requests, and that no evidence shows they did. (Pl.'s Med. Opp'n Br. 8–9, 11–12.) That may be so. But it shows at most that a nurse could have acted differently, and the Eighth Amendment asks what she knew, not what she might have done. The inference that Plaintiff asks the jury to draw, that each nurse understood a report of back pain and a request for a cane as an urgent report of a substantial risk of serious harm and chose to ignore it, rests on speculation. A non-movant cannot defeat summary judgment with speculation. *See Matsushita*, 475 U.S. at 586–87. What Plaintiff's account may establish is a missed opportunity to pass a request along. That is negligence at most, and negligence is not an Eighth Amendment violation. *DiFraia*, 171 F.4th at 628–29.

*Fourth*, Plaintiff's "nonmedical reasons" argument misreads the cases. He contends that because the Medical Defendants rely on "non-medical constraints" to explain why they did not provide the cane, they were deliberately indifferent "by definition." (Pl.'s Med. Opp'n Br. 8.) Delay or denial for nonmedical reasons is deliberate indifference when an official who knows that treatment is medically necessary withholds it for reasons unrelated to the patient's needs, such as retaliation, the intent to inflict pain, or cost. *DiFraia*, 171 F.4th at 629–30. The conduct that satisfied that standard at the pleading stage in this case was that officials allegedly refused to help because of Plaintiff's "penchant for complaining" and because they regarded him as an "asshole." *Durham*, 82 F.4th at 230. There is no evidence of anything comparable as to either nurse: no hostile remark, no suggestion that either acted from ill will or to save money, and no evidence that either refused to relay a request because of who Plaintiff was. Neither nurse is alleged to have taken Plaintiff's cane or to have decided that he could not have it. Treating every limit on a nurse's

authority as a "nonmedical reason" for her inaction would make each such limit a source of constitutional liability, and the Eighth Amendment does not work that way.

*Fifth*, the record on medical necessity points the same direction as to these Defendants. *DiFraia* stresses that the care withheld must be "medically necessary." 171 F.4th at 630. A physician ordered Plaintiff a cane for six months, and a different physician ordered another after the fall, so a jury could find that Plaintiff medically needed a cane in some period. But the last order had run out before quarantine, and no provider had renewed it. The Court does not hold that a lapsed order forecloses a finding that Plaintiff still needed a cane. It holds only that, absent a provider's determination, the nurses had no basis in the record to know that withholding a cane posed a substantial risk of serious harm, and Plaintiff offers no evidence that they drew that inference.[5]

Finally, Plaintiff stresses that Ebo was not deposed and offered no testimony denying the pre-fall conversations. (Pl.'s Med. Opp'n Br. 11–12.) The Medical Defendants accept Plaintiff's account for purposes of their motion, and the Court has taken it as true. The point is not that the conversations did not occur. It is that, as Plaintiff describes them, they do not show conscious disregard of a substantial risk. Ebo's conduct after the fall, assessing Plaintiff, contacting the on-call provider, and arranging his admission to the infirmary, does not prove what she knew on May 30 and 31, as Plaintiff observes, but it supplies no support for an inference of indifference either. On this record, no reasonable jury could find that either Medical Defendant was deliberately

---

[5] Plaintiff distinguishes *Bundrick v. Hammond*, 817 F. Supp. 470 (D. Del. 1993), and *Inmates of Allegheny County Jail v. Pierce*, 612 F.2d 754 (3d Cir. 1979), on the ground that no professional judgment was exercised here. (Pl.'s Med. Opp'n Br. 9–11.) The Court need not rely on either case. The absence of a professional judgment matters when an official had the authority and the occasion to make one, and Plaintiff identifies no evidence that either nurse was asked to decide whether he needed a cane. He asked each of them for the device itself.

indifferent. The Court grants summary judgment to Spingler and Ebo on the Eighth Amendment claims.

**2. The ADA and RA Claims**

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Title II applies in state prisons. *Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998). The RA's prohibition is materially the same, except that the program must receive federal financial assistance. 29 U.S.C. § 794(a); *Durham*, 82 F.4th at 225. A plaintiff must show that he is a qualified individual with a disability who was excluded from or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against, by reason of his disability. *Haberle v. Troxell*, 885 F.3d 170, 178 (3d Cir. 2018). Prison showers are a covered service. *Furgess v. Pa. Dep't of Corr.*, 933 F.3d 285, 289–91 (3d Cir. 2019); *Durham*, 82 F.4th at 225–26. A public entity must make reasonable modifications to its policies, practices, or procedures when necessary to avoid disability discrimination unless doing so would fundamentally alter the service, program, or activity. 28 C.F.R. § 35.130(b)(7)(i). A plaintiff who seeks compensatory damages must also show intentional discrimination, which the Third Circuit measures by deliberate indifference: "(1) knowledge that a federally protected right is substantially likely to be violated . . . and (2) failure to act despite that knowledge." *Durham*, 82 F.4th at 226 (citing *Haberle*, 885 F.3d at 181). That standard is lower than the Eighth Amendment's, because it does not require knowledge of a substantial risk of serious harm. *Id.* at 229.

Plaintiff's theory against the Medical Defendants is that they failed to respond to his need for a mobility aid and so left him without meaningful access to the shower. (Pl.'s Med. Opp'n Br. 12–14.) The claim fails for two related reasons.

*First*, the conduct Plaintiff attributes to the nurses is a failure to provide medical care: they did not assess his back pain, refer him to a provider, or obtain his cane. The ADA and the RA are not vehicles for challenging the adequacy of medical treatment, and a failure to provide adequate medical care to a disabled inmate does not, standing alone, give rise to liability under either statute. *See Montanez*, 154 F.4th at 147; *DiFraia*, 171 F.4th at 632–33. The service at issue in this case is the shower, which the corrections department, and not UCHC's nurses, controls. Nothing in the record suggests that either nurse had authority over the unit's physical plant, the equipment in its showers, or the rules governing inmates' property and movement, and Plaintiff points to none. (*See* Med. SUMF ¶¶ 25–26.) The State's alleged failure to make the shower safely accessible is the subject of the claims against the Corrections Officer Defendants in their official capacities, which the Court addresses below, and nothing in this ruling forecloses them.

*Second*, even if the nurses' conduct could be recast as a failure to accommodate, Plaintiff has not shown deliberate indifference. He identifies no evidence that either nurse knew that his federally protected right to safe use of the shower was substantially likely to be violated. He told the nurses that he had back pain and wanted his cane; he does not claim to have told either that he could not safely shower, and neither knew that the quarantine shower lacked a chair or handrails. (Med. Resp. to SSMF ¶¶ 18–20.) Plaintiff responds that an ADA plaintiff need not identify the precise accommodation he needs when the barrier and the need for assistance are apparent. (Pl.'s Med. Opp'n Br. 13–14.) That may be a fair statement of the law as to the entity responsible for the barrier, but it does not supply the knowledge element as to nurses who had no reason to connect a

request for a cane to a shower they neither controlled nor were told about. Knowing that a patient has a back condition and wants his cane is not knowing that a federally protected right is substantially likely to be violated. *See Haberle*, 885 F.3d at 181; *S.H. ex rel. Durrell v. Lower Merion Sch. Dist.*, 729 F.3d 248, 263–65 (3d Cir. 2013). And the second prong of the standard requires a deliberate choice to do nothing, not negligence or bureaucratic inaction. *See S.H.*, 729 F.3d at 263. The Court grants summary judgment to the Medical Defendants on the ADA and RA claims.

### 3. Prospective Relief

To the extent Plaintiff seeks prospective relief against the Medical Defendants, the claim is moot. Plaintiff is no longer in the quarantine unit, he has since received a new cane order, and Ebo no longer works at NJSP. (Med. SUMF ¶¶ 41, 43, 51; Pl.'s Med. Resp. ¶¶ 41, 43, 51.) Plaintiff does not argue otherwise; he asks only that any mootness ruling be confined to forward-looking relief. (Pl.'s Med. Opp'n Br. 15.) A plaintiff who seeks prospective relief must show a real and immediate threat of future injury, and past exposure to allegedly unlawful conduct does not by itself establish a present controversy about injunctive relief. *City of Los Angeles v. Lyons*, 461 U.S. 95, 102–03 (1983). The Court therefore dismisses the claims for prospective relief against the Medical Defendants as moot. That ruling does not affect Plaintiff's claims for damages, which the Court resolves above.

## C. The Corrections Officer Defendants' Motion

The Corrections Officer Defendants seek summary judgment on Plaintiff's ADA and RA claims against them in their official capacities and on his Eighth Amendment claims against them individually. They make five arguments, which the Court addresses in connection with the claims to which each relates: (1) they had no legal duty to do more than they did in response to Plaintiff's

complaints, as non-medical officials who could rely on medical staff; (2) Plaintiff lacked a valid cane authorization when he asked for his cane and so had no "legal right" to one; (3) they followed an established policy that barred canes in the unit and lacked authority to override it; (4) Plaintiff had an administrative process, paper medical request forms, that he did not use; and (5) there is no evidence that they knew of a substantial risk of serious harm. (CO Defs.' Reply Ltr. 2–11, ECF No. 116.) The Court addresses the ADA and RA claims first.

### 1. The ADA and RA Claims

The elements are set out in Part III.B.2. The Corrections Officer Defendants do not dispute that Plaintiff is a qualified individual with a disability or that the New Jersey Department of Corrections is a public entity that receives federal funds. (*See* Pl.'s CO Opp'n Br. 4 (citing ECF No. 110-1 at 10).) In their reply, they also do not dispute that prison showers are a covered service. *See Furgess*, 933 F.3d at 289–91; *Durham*, 82 F.4th at 225–26. The questions are whether a reasonable jury could find that Plaintiff was denied meaningful access to the shower by reason of his disability, and, for damages, that the State acted with deliberate indifference.

*a. Denial of meaningful access by reason of disability.* A reasonable jury could find that Plaintiff was denied meaningful access to the quarantine shower. *See Alexander v. Choate*, 469 U.S. 287, 301 (1985). Plaintiff testified that his spinal condition makes it harder to walk, stand, stay steady, and shower; that his cane improves his steadiness in the shower; that the quarantine shower had no chair or handrails; and that when he went to shower without his cane, pain shot into his legs and he fell. (Durham Dep. I 45:5–25; Durham Dep. II 69:19–70:11, 91:12–92:7.) The Corrections Officer Defendants offer no evidence to the contrary. Their only response on the shower's condition is that a photograph was not produced, which is not evidence. (CO Resp. to SSMF ¶ 33.) An inmate without Plaintiff's condition could use the shower as provided, which is

what makes the denial one "by reason of" his disability. *See Furgess*, 933 F.3d at 291–92; *Durham*, 82 F.4th at 226 (the ADA requires but-for causation). Nor does Plaintiff's placement in quarantine answer the claim. The Third Circuit has held that moving an inmate to another unit is not a sufficient reason to withhold accessible facilities or to ignore complaints about them. *Durham*, 82 F.4th at 226 (citing *Furgess*, 933 F.3d at 291–92).

*b. The Corrections Officer Defendants' arguments.* None of the five arguments entitles them to judgment on the ADA and RA claims.

*Duty to act and the division of labor.* The first argument rests on *Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004), which holds that a non-medical official may generally rely on the judgment of medical staff who are treating a prisoner. *Spruill* is an Eighth Amendment case about the mental state of individual officials. It says nothing about the obligation Title II places on a public entity to make reasonable modifications, and the ADA and RA claims here are not claims against the officers personally. They are claims against the State. *Will*, 491 U.S. at 71. The argument that individual officers lacked the authority to modify policy is therefore beside the point. The State acts through its officials, and the question is whether the State, which has the power to modify its policies and practices, knew that Plaintiff needed an accommodation and failed to provide a reasonable one. *See* 28 C.F.R. § 35.130(b)(7)(i); *Furgess*, 933 F.3d at 292.

*Authorization and "standing."* The Corrections Officer Defendants contend that because Plaintiff's cane order had lapsed, he had no legal right to a cane and "does not have standing" to bring these claims. (CO Defs.' Reply Ltr. 5.) Plaintiff has standing. He alleges and offers evidence of a concrete injury, a fall in the shower that injured his shoulder, that is traceable to the alleged denial of an accommodation and is redressable by damages. The argument is really a merits argument, and it fails for three reasons. First, Title II does not condition an inmate's right to a

reasonable modification on a physician's order. It asks whether the modification is necessary to avoid discrimination and is reasonable. The cane order is evidence of Plaintiff's need, not the source of his right. Second, the Corrections Officer Defendants "took no position" on whether Plaintiff needed a cane after the order lapsed. (*Id.*) Their argument assumes the answer to the question that matters. Third, the record gives a jury ample reason to doubt that the end of the six-month period meant the end of Plaintiff's need or of his permission to possess the cane. The order does not say that his condition would resolve or that anyone should take the cane when the period ended. (Cane Order, ECF No. 113-4.) Plaintiff kept and used the cane for roughly two weeks after the period ran, and he testified that earlier renewals never required him to surrender it. (Durham Dep. II 82:11–83:9, 99:22–100:2.) The Department's own policy states that aids such as canes "will be available when an inmate's health would be adversely affected without such devices," and it ties availability to health, not to the date on a prior order. (MED.IMHC.12, ECF No. 114-11 at 2.) The officers' contrary understanding, that a cane requires a current "script," was offered with qualification: Correa answered "[t]o the best of my knowledge" and "if I remember correctly." (Correa Dep. 42:23–43:4.)

*Policy and the duty to modify.* The Corrections Officer Defendants next argue that a policy barred canes in the unit. A public entity must make reasonable modifications to its policies when necessary to avoid discrimination unless it can show that doing so would fundamentally alter the service, program, or activity. 28 C.F.R. § 35.130(b)(7)(i). The existence of a restrictive policy does not satisfy that burden, and whether an accommodation would impose an undue burden or fundamentally alter a program because of security concerns is a question of fact on which the entity must make a record. *See Chisolm v. McManimon*, 275 F.3d 315, 325–28 (3d Cir. 2001) (reversing summary judgment for a jail that cited security and administrative concerns). Genuine disputes of

material fact remain on each part of the Corrections Officer Defendants' position. As to the content of the policy, the written Ad-Seg IMP they cite does not mention canes; it limits inmates to specified property, and the specified list says nothing about mobility aids. (Ad-Seg IMP at DEF 019–20.) As to its application, 7-Wing was an ad-seg unit that had been repurposed for quarantine, and inmates were sent there because they tested positive, not because of misconduct. The officers' testimony that the unit was run "pretty much" like ad-seg does not establish that every ad-seg property rule applied to quarantined inmates, and Gray conceded that he never read the policy and relied on what other officers told him. (Gray Dep. 21:19–22:7, 26:6–11, 28:8–16; Correa Dep. 36:8–16, 41:20–23; CO Resp. to SSMF ¶¶ 22–25 (disputing only Plaintiff's paraphrase in ¶ 24); *see* Pl.'s CO Resp. ¶¶ 13–14.) Goodwin could not recall any policy on canes in quarantine. (Goodwin Dep. 27:5–20.) As to the safety rationale, Correa agreed that a cane could be used as a weapon but also that any object could, and he described a shower process in which an inmate was released alone, walked to a separate room, and was locked in until an officer reopened the door. (Correa Dep. 41:13–19, 46:12–23, 47:12–21, 48:8–49:8.) No officer testified to an individualized assessment of whether Plaintiff's cane posed a risk, and no one has identified evidence that alternatives were considered or infeasible, such as supervised cane use during the escort to the shower, a chair, handrails, or review by medical staff. A jury could conclude on this record that the State applied a blanket restriction without determining whether a safe modification was available, and that the Corrections Officer Defendants have not shown that a reasonable modification would have fundamentally altered the unit's operations.[6]

---

[6] The copy of MED.IMHC.12 in the record was last revised in February 2021, after the events at issue. Neither side suggests that the language relevant here differed in 2020, and the Corrections Officer Defendants rely on it themselves. (CO Defs.' Reply Ltr. 6–7.) If the policy's 2020 text proves to be material, the parties may address it at trial.

*Administrative process.* The fourth argument is that Plaintiff could have submitted paper medical request forms. The ADA does not require a prisoner to use a particular form to make a known need for accommodation known to the entity; the entity's knowledge "can be demonstrated by ignoring complaints." *Durham*, 82 F.4th at 230 (citing *Furgess*, 933 F.3d at 292). In any event, the record supports Plaintiff on the premise of the argument. An inmate in 7-Up could not retrieve a paper form on his own and had to ask an officer or medical staff for one, and the kiosk was broken. (Gray Dep. 37:17–25; Durham Dep. II 57:13–58:19; CO Resp. to SSMF ¶ 16.) The Corrections Officer Defendants argue that Plaintiff does not claim to have asked an officer for a form. (CO Defs.' Reply Ltr. 3–4.) But Plaintiff testified that he repeatedly asked officers for his cane and to see a doctor, which put those officers on notice, and an entity that controls the only route to a paper form cannot fault an inmate for not having one.

*c. Deliberate indifference.* For damages, Plaintiff must show that the State knew that a federally protected right was substantially likely to be violated and failed to act despite that knowledge. *Durham*, 82 F.4th at 226. The Third Circuit held that Plaintiff's allegations met that standard: he had a diagnosis and a cane prescription, he used the cane to walk, he "made numerous prison officials aware that he had a cane, needed a cane to walk, and was in severe pain without it," and he was "continuously denied his cane and shower accommodations." *Id.* The record now supports those allegations. The State's own records contained the cane order. (Cane Order, ECF No. 113-4.) Plaintiff testified that he asked Correa, Vega, and Kelley for his cane and help with his pain, and that Doyle told him at the outset to leave it in his cell. (Durham Dep. I 41:7–44:17.) Gray recalls Plaintiff asking him for the cane. (Gray Dep. 30:3–20.) It is undisputed that Plaintiff did not receive his cane before he fell, and the record contains no evidence that he received a chair, handrails, or a medical evaluation of his back in the days that followed. It is also undisputed that

officers could have escalated Plaintiff's requests to a supervisor or to medical staff. (CO Resp. to SSMF ¶¶ 10–12, 14, 17, 19; Goodwin Dep. 16:20–25.) The Corrections Officer Defendants respond that no officer knew of the diagnosis of lumbar stenosis and that Plaintiff's reports of back pain were "general." (CO Defs.' Reply Ltr. 3.) But the ADA standard does not require knowledge of a diagnosis or of a substantial risk of serious harm; it requires knowledge that an accommodation was needed and had not been provided. *Durham*, 82 F.4th at 229; *Furgess*, 933 F.3d at 292. A jury could find that standard met. The motion is denied as to the ADA and RA claims.[7]

### 2. The Eighth Amendment Claims

The elements and the standard are set out in Part III.B.1.a. The Corrections Officer Defendants dispute only whether they were deliberately indifferent. (CO Defs.' Reply Ltr. 10–11.) The Third Circuit has recognized that a non-medical official may not be held liable merely because he failed to respond to the medical complaints of a prisoner who is under a doctor's care. "If a prisoner is under the care of medical experts . . . a non-medical prison official will generally be justified in believing that the prisoner is in capable hands," and absent "a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner," the official will not be chargeable with deliberate indifference. *Spruill*, 372 F.3d at 236. But non-medical officials can be deliberately indifferent. They may not "deny reasonable requests for medical treatment . . . when such denial exposes the inmate to undue suffering or the threat of

---

[7] The Corrections Officer Defendants have not argued that sovereign immunity bars Plaintiff's damages claim under the ADA, and the Court does not decide that question here. The RA claim is not barred, because the State waived its immunity by accepting federal funds. *Durham*, 82 F.4th at 227–28 (citing *Bowers v. NCAA*, 475 F.3d 524, 545 (3d Cir. 2007)). As to the ADA, whether Title II abrogates immunity for damages turns, in this context, on whether the conduct at issue actually violated the Fourteenth Amendment, through the Eighth Amendment. *United States v. Georgia*, 546 U.S. 151, 158–59 (2006); *Durham*, 82 F.4th at 228. Because genuine disputes remain on the Eighth Amendment claim, the Court will address the issue, if it becomes necessary, once the facts are found.

tangible residual injury." *Durham*, 82 F.4th at 229–30 (quoting *Palakovic v. Wetzel*, 854 F.3d 209, 228 (3d Cir. 2017)). The Third Circuit applied those principles to the allegations in this case and held that they showed deliberate indifference, including because Plaintiff alleged that officials declined to help for nonmedical reasons. *Id.* at 230. In *DiFraia*, the court cited that holding as an example of the kind of nonmedical reason that matters. 171 F.4th at 629–30.

Viewed in Plaintiff's favor, the record would permit a reasonable jury to find that each element is met as to the Corrections Officer Defendants.

*Knowledge.* Plaintiff testified that he reported serious back pain and the need for his cane to Correa, Vega, and Kelley, and that Doyle, to whom he also said he needed the cane, ordered him to leave it behind. (Durham Dep. I 41:7–44:17; Durham Dep. II 93:20–94:7.) Goodwin and Jovanovic knew that Plaintiff had a cane, and the verified Complaint states that when Correa telephoned them about Plaintiff's access to it, they refused. (Goodwin Dep. 24:6–25:9; Jovanovic Dep. 16:23–18:13; Compl. ¶ 26.) Gray recalls the request. (Gray Dep. 30:3–20.) The Corrections Officer Defendants say that Plaintiff's complaints were "general" and that they could not understand the significance of a diagnosis they did not know about. But the question is not whether an officer knew a diagnosis. It is whether he was aware of facts from which he could infer, and did infer, a substantial risk of serious harm, and a jury may find that knowledge from the obviousness of the risk. *Farmer*, 511 U.S. at 842. The Third Circuit has already observed that it is "not hard to imagine how dangerous a shower could be for someone suffering from back pain and an inability to walk or stand on their own." *Durham*, 82 F.4th at 230. An officer who has seen an inmate walk with a cane, and who is told by that inmate that he is in serious pain and needs it, can be found to have understood as much. *Cf. Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 582–83 (3d Cir. 2003) (detainee's report that he was insulin-dependent, together with a chart entry and a

physician's note, supported a finding of knowledge). Plaintiff did not have to show the officers a prescription or a diagnosis for a jury to draw that inference.

*Disregard.* It is undisputed that Plaintiff did not receive his cane before he fell. Plaintiff testified that he also received no chair and no medical evaluation of his back, and Defendants identify no pre-fall evaluation in the record. (CO Resp. to SSMF ¶ 19.) Plaintiff's testimony, which Defendants do not contradict, is that he asked officers repeatedly for help and to see a doctor and that nothing came of it. (Durham Dep. I 41:7–44:17, 69:22–70:3; Durham Dep. II 59:22–60:9.) Gray told Plaintiff that he would ask a supervisor, who would probably speak to medical staff, but he does not recall whether he did. (Gray Dep. 31:18–33:18.) Correa's telephone call produced a refusal from the unit that held the cane and, so far as the record shows, no further step. Nothing in the record shows that any officer contacted medical staff. The officers' own testimony is that referral or escalation was the expected response to a request involving a needed medical device. (Goodwin Dep. 16:20–25; Gray Dep. 31:18–33:18.) A failure to recall whether one took a step that the officer himself describes as routine does not contradict Plaintiff's account, and the Court may not credit an officer's lack of memory over Plaintiff's affirmative testimony on summary judgment. *Anderson*, 477 U.S. at 255.

*Spruill and the availability of other channels. Spruill* does not entitle the officers to summary judgment, because it protects officials who defer to a prisoner's ongoing medical care, and a jury could find that Plaintiff had none for his back in quarantine. The officers controlled the routes to medical attention. The kiosk was broken, paper forms had to be requested from an officer or a nurse, nurses entered the tier only with an officer, and a non-emergent request to a nurse had to be routed back through sick call. (Durham Dep. II 57:13–58:19; Gray Dep. 37:17–25; Med. SUMF ¶ 25; Spingler Dep. 21:2–12, 23:21–24:6.) A jury could find that the officers knew they

were the link and did not use it, and that their inaction, in a unit where they controlled every route to medical care, amounted to preventing Plaintiff from getting medical help. The Third Circuit has recognized that liability may lie where a prison keeps a sick prisoner from getting any medical help. *See DiFraia*, 171 F.4th at 629 (citing *Monmouth Cnty. Corr. Inst. Inmates v. Lanzaro*, 834 F.2d 326, 346–47 (3d Cir. 1987)). The Corrections Officer Defendants' position, in the end, is that they are entitled to summary judgment even if they "ignored [Plaintiff's] complaints of back pain and denied his requests for access to a cane." (CO Defs.' Reply Ltr. 4.) *Spruill* does not go that far. It protects officials who reasonably rely on a prisoner's medical care, not officials who are the only available route to that care and decline to use it. Their argument that Plaintiff's "informal verbal complaints" were not requests for medical care also overlooks his testimony that he asked staff to see a doctor. (Durham Dep. I 69:22–70:3.)

*Nonmedical reasons.* The Court also notes the evidence of nonmedical reasons. The verified Complaint attributes to Goodwin and Jovanovic the statements that Plaintiff "complains" too much and is "an asshole" who "gets nothing." (Compl. ¶ 26.) The Corrections Officer Defendants themselves cite that paragraph and none of them has offered evidence denying it. (CO SUMF ¶ 15.) Plaintiff's brief does not emphasize these statements, but the Court may consider the verified Complaint as an affidavit, and the Third Circuit identified allegations of just this kind as showing deliberate indifference. *Durham*, 82 F.4th at 230. A refusal to give an inmate his cane because he complains too much is a refusal for a nonmedical reason.

The Corrections Officer Defendants' remaining arguments do not change the result. They contend that Plaintiff lacked authorization and that they were bound by the unit's policy. As discussed above, whether the cane restriction applied to quarantine and whether Plaintiff still needed the cane are disputed. And even if the officers lacked authority to give Plaintiff the cane,

that would not explain a failure to alert a supervisor or medical staff, the steps the officers themselves describe as the expected response. An official who knows that an inmate faces a substantial risk of serious harm cannot avoid liability simply by pointing to a rule that prevents him from addressing it directly when he could have reported it to someone who could. *See Farmer*, 511 U.S. at 844 (an official may escape liability if he "responded reasonably to the risk"). *Natale* is not distinguishable on the ground the Corrections Officer Defendants urge, that the plaintiff there had a physician's note and a chart entry while Plaintiff showed the officers no authorization. (CO Defs.' Reply Ltr. 7–8.) The court there considered the detainee's own report together with a chart entry and a physician's note as evidence of knowledge, but nothing in the opinion makes documentation a prerequisite to it. 318 F.3d at 582–83. Here, the State's own records documented the cane order, and officers who had seen Plaintiff with a cane did not need to see the order to understand his request.

The evidence differs by Defendant. Plaintiff's evidence that he told Correa, Vega, and Kelley of his pain and need for the cane, and that Doyle ordered him to leave the cane behind, rests principally on his own testimony, which the officers, who largely do not recall, do not contradict; Gray's testimony partly corroborates the request to him. The evidence as to Goodwin and Jovanovic rests principally on the verified Complaint. Whether a jury will credit Plaintiff's account as to each officer, and whether the evidence will suffice to find each one liable, are questions for trial.[8] The motion is denied as to the Eighth Amendment claims.

---

[8] The Corrections Officer Defendants do not dispute causation or harm, and they do not argue in the briefing before the Court that any individual officer lacked personal involvement or that qualified immunity applies. The Court therefore does not address those issues. *See Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988) (personal involvement required in a § 1983 action); Fed. R. Civ. P. 56(f).

### D. Remaining Matters

Two matters remain. *First*, other defendants named in the Complaint, among them Nurse West and Officers Rodriguez and Vincente, are not parties to these motions, and the docket reflects that service or appearances as to them are unresolved. The parties shall address their status in the joint correspondence described below. *Second*, mootness is jurisdictional. Plaintiff conceded that his claims for prospective relief against the Medical Defendants are moot, but the Corrections Officer Defendants have not addressed whether any claim for prospective relief against them remains live, given that Plaintiff has left the quarantine unit and has received a new cane. The Court expresses no view on that question and directs the parties to address it in the same correspondence.

## IV. CONCLUSION

For the reasons above, the Medical Defendants' Motion for Summary Judgment (ECF No. 107) is **GRANTED**, and the Corrections Officer Defendants' Motion for Summary Judgment (ECF No. 110) is **DENIED**. The claims against the Medical Defendants for prospective relief are dismissed as moot, and summary judgment is entered for the Medical Defendants on the remaining claims against them. The case will proceed to trial as to the Corrections Officer Defendants, and the Court will refer it to the Magistrate Judge for pretrial scheduling. The parties shall file the joint correspondence described in Part III.D within fourteen days, as set forth in the accompanying Order. An appropriate Order follows.

MAShipp

MICHAEL A. SHIPP
UNITED STATES DISTRICT JUDGE

Dated: 11/24/26